# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 CR 410 - 2, 4, 5 | **DATE** | 5/7/2001 |
| **CASE TITLE** | USA vs. Gonzalez, Rodriguez, and Chavez | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   The defendants' motions for a mistrial [168-1] and for a new trial [149-1, 150-1] are denied.  Enter memorandum opinion and order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | 6 |
| ✓ | Notices mailed by judge's staff. | MAY 0 8 20 | |
| | Notified counsel by telephone. | date docketed | |
| | Docketing to mail notices. | docketing deputy initials | |
| | Mail AO 450 form. | 5/7/2001 | |
| | Copy to judge/magistrate judge. | date mailed notice | |
| MPJ | courtroom deputy's initials | MPJ mailing deputy initials | |

Document Number

174

C I MAY -7 PM 4:05

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LUIS GONZALEZ, | ) | No. 00 CR 0410 |
| DAVID CARLOS PEREZ, | ) | |
| JAIME RODRIGUEZ, and | ) | |
| ALPHONSO CHAVEZ, | ) | |
| | ) | |
| Defendants. | ) | |

MAY 0 8 2001

## MEMORANDUM OPINION AND ORDER

On February 7, 2001, Luis Gonzalez, Jaime Rodriguez and
Alphonso Chavez were convicted of conspiracy to possess cocaine
with the intent to distribute. Mr. Gonzalez and Mr. Rodriguez were
also convicted of attempt to possess cocaine with intent to
distribute.[1] On February 8, Mr. Chavez brought a motion for a
mistrial based on the post-verdict discovery that his attorney's
business card had been in the wallet of one of the other
defendants[2] when the wallet, which was admitted into evidence, went
back to the jury for deliberations. He also claimed that the
government's examination of Mr. Perez, in which the Assistant
United States Attorney ("AUSA") asked Mr. Perez if he was afraid to
testify, was so prejudicial that a mistrial was necessary. Mr.

---

[1] David Carlos Perez pled guilty to possession of cocaine
with intent to distribute on January 26, 2001.

[2] Mr. Chavez claimed in his motion that it was in Mr.
Rodriguez's wallet, but the wallet that went back to the jury was
identified as belonging to Mr. Gonzalez.



Gonzalez filed a motion for a new trial, joined by Mr. Chavez and Mr. Rodriguez, claiming the same errors as Mr. Chavez's original motion as well as six other errors that he claims would merit a new trial. I treat all of the arguments raised by Mr. Gonzalez as raised by Mr. Chavez and Mr. Rodriguez, and I treat Mr. Chavez's motion for a mistrial as one for a new trial under Fed. R. Crim. P. 33. The motions are denied.

I.

The government's theory at trial was that Mr. Chavez, Mr. Rodriguez and Mr. Gonzalez were part of a conspiracy to possess and distribute approximately 130 kilograms of cocaine. The evidence showed that, on May 24, 2000, Mr. Perez was pulled over by a state trooper (for driving 59 m.p.h. in a 55 m.p.h. zone) on Interstate 57 near Effingham, Illinois, while he was driving a tractor-trailer full of watermelons. He consented to a search of his truck, which uncovered wrapped packages of cocaine in a concealed trap compartment. Mr. Perez testified before the grand jury and at trial that he believed he was carrying marijuana, not cocaine. He agreed to cooperate with law enforcement officers and make a controlled delivery of the drugs. Mr. Perez testified that, at the time of his arrest, he did not know to whom he was supposed to deliver the drugs; someone was supposed to page him *en route* to arrange the drop.

While Mr. Perez was cooperating with law enforcement, he received a page from a number that belonged to a cell phone that was later recovered by the government from the green Jetta driven by Mr. Gonzalez. Telephone records showed that the same cell phone made calls to Mr. Rodriguez's cell phone. In a series of telephone conversations that were taped by the government, Mr. Perez arranged a meeting at the Comfort Inn hotel in Bolingbrook, Illinois. Mr. Gonzalez testified that the "unidentified male voice" on the tapes was his voice, and that he and Mr. Rodriguez went to the Comfort Inn to meet with Mr. Perez at around 2:30 a.m.

The following day, Mr. Chavez received a telephone call at work from his brother, Ramon.[3] Mr. Chavez testified that Ramon asked him to arrange for a warehouse to "soup up" a truck for a tractor pull, a sort of sport in which tractor trailer trucks pull heavy loads. Mr. Chavez arranged for use of the Acme Warehouse in Des Plaines, Illinois, at around 7:00 p.m. on May 25; he offered to pay two employees of the warehouse $500 each for their assistance. Around 10:00 a.m., Mr. Gonzalez told Mr. Perez that the delivery would be around 7:00 p.m., so that it would be "a little later, and so it'll be quieter, so there won't be so many people." During the day, Mr. Perez delivered the load of watermelons and drove his truck, without the trailer, to the interstate oasis in Des Plaines.

---

[3] Ramon Chavez was originally named in the complaint, but he was not indicted with the defendants in this case.

Mr. Gonzalez drove to the oasis, followed by Mr. Rodriguez. Mr. Chavez picked up his brother Ramon in Chicago and drove with him to the oasis.

At the oasis, Mr. Gonzalez met and spoke with Mr. Perez and Ramon. Mr. Rodriguez was inside the building at the oasis, but Mr. Gonzalez testified that he went into another store and did not take part in the conversation with the others. Mr. Chavez dropped Ramon off and then went to park the car. He walked up to Ramon at the table with the others, and Ramon told him to go ahead and meet him at the warehouse. Mr. Chavez left, taking back roads to the warehouse. Mr. Gonzalez and Ramon left the meeting and went to a tool store, where they bought two sets of metric hex wrenches and some screwdrivers, and from there they drove to the warehouse. Mr. Perez drove the truck and followed Mr. Rodriguez to the warehouse, where Mr. Chavez was inside using the rest room. Mr. Rodriguez made a call on his cell phone and told the party on the other end of the line that he was worried they had been followed by the police. Telephone records show two calls from Mr. Rodriguez's cell phone to Mr. Gonzalez's cell phone around 7:00 p.m.

Mr. Rodriguez and Mr. Chavez were arrested at the warehouse, and they both attempted to flee on foot. Mr. Gonzalez and Ramon turned the car around and tried to flee in their car, but they were pulled over and arrested. The government recovered the wallets, cell phones and personal effects from all of the defendants at the

4

scene. In Mr. Gonzalez's wallet, there was a cell phone receipt for a telephone number of a cell phone that was not recovered; Mr. Rodriguez also had cell phone receipts for this number. On the back of the receipt in Mr. Gonzalez's wallet, there were several telephone numbers, as well as notes that the government argued corresponded to Mr. Perez's location from one of the phone calls of the previous day. There was also a list of numbers that added up to 127, with the notation "one for the driver" that the government argued represented the number of packages of cocaine the defendants were expecting. The government recovered 139 packages of cocaine from the compartment in the truck. Mr. Rodriguez did not testify. Mr. Gonzalez testified that he never knew what was in the truck and that he thought he was going to the warehouse to fix a truck that was broken down. Mr. Chavez testified that he thought he was going to rig a truck with nitrous oxide in order to cheat in a tractor-pull.

II.

Mr. Gonzalez's motion for a new trial, joined by Mr. Chavez and Mr. Rodriguez, alleges eight errors. He claims that: (1) I should have instructed the jury that the interpreter's translation of the phrase "broken down" was inaccurate; (2) the presence of Mr. Chavez's attorney's card in Mr. Gonzalez's wallet was extrajudicial evidence that the jury should not have been permitted to consider; (3) the defendants were denied the right of confrontation when I

allowed the transcripts of the telephone conversations to go back to the jury because they contained dates about which there was no testimony; (4) an irrational verdict as to Mr. Chavez violated all of the defendants' constitutional rights; (5) the instructions were deficient because they failed to define "possession" and "prohibited drug;" (6) the government's questions on re-cross of Mr. Perez about why he changed his mind about accepting a plea agreement from the government were unfounded and amounted to improper extrajudicial "testimony" by the government; (7) I should have granted a hearing on Mr. Gonzalez's motion to suppress the evidence based on racial profiling; and (8) I should not have given the "ostrich" instruction.[4]

Under Fed. R. Crim. P. 33, I may grant a new trial "if the interests of justice so require." A jury verdict should not be overturned lightly, but only where the "evidence 'preponderates heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand,'" *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999), or where a constitutional error had a reasonable probability of affecting the verdict, *United States v. Berry*, 64 F.3d 305, 307 (7th Cir. 1995).

---

[4] Mr. Chavez raised grounds (2) and (6) in his motion for mistrial.

6

Mr. Gonzalez renews his arguments about my rulings on racial profiling and the "ostrich" instruction,[5] but he provides no reasoning or authority to suggest that they were in error, and provides no basis for me to reconsider my prior rulings. In reply, he argues that I should find that Mr. Perez's counsel was ineffective for failing to move to suppress on the basis of racial profiling, but I have already held that Mr. Gonzalez lacks standing to raise this argument on behalf of Mr. Perez. *See* Minute Order of 2/20/2001; *Allen v. Wright*, 468 U.S. 737, 755 (1984).

Likewise, Mr. Gonzalez does not provide any support for his argument that an "irrational" verdict as to Mr. Chavez (he was convicted of conspiracy to possess cocaine but acquitted of attempted possession of cocaine) implicates the constitutional rights of any of the defendants. The Seventh Circuit has routinely held that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *Thompson v. Boggs*, 33 F.3d 847, 856 (7th Cir. 1994). But even if I were to consider his argument on the merits, it has none. There is no inconsistency between a guilty verdict on conspiracy to possess cocaine, which requires only that the defendant himself knows of and intends to participate in the conspiracy and a verdict of not

---

[5] On February 5, I ruled from the bench that I would include the "ostrich" instruction.

guilty on attempted possession, which requires that the defendant himself have committed a substantial step in furtherance of the crime. *United States v. Hunte*, 196 F.3d 687, 691 (7th Cir. 1999). Moreover, even if the verdicts were inconsistent, mere inconsistency provides no basis for a new trial. *United States v. Sims*, 144 F.3d 1082, 1084 (7th Cir. 1998).

B.

Mr. Gonzalez argues that I failed to instruct the jury on all of the elements of the crimes charged because I failed to define the terms "possession" and "prohibited drug." Due process requires that a jury be instructed as to each essential element of a crime. *Cole v. Young*, 817 F.2d 412, 423 (7th Cir. 1987). But the crime with which the defendants were charged was *attempted* possession, which punishes the preparation or attempt, not the actual possession of a prohibited drug. *United States v. Valencia*, 907 F.2d 671, 686 (7th Cir. 1990). Possession is not an essential element of attempt, nor is the nature of the drug involved, and therefore it is not an error to fail to define "possession" or "prohibited drug" where the crime charged is attempted possession. *See id.* (holding that it was not error to omit definition of "possession" where crime charged was attempted possession). Moreover, none of the defendants objected to the omission of those definitions from the instruction or proposed a definition before I instructed the jury, so they cannot now claim that it was error.

8

*United States v. Requarth*, 847 F.2d 1249, 1252 (7th Cir. 1988);
Fed. R. Crim. P. 30.

C.

The telephone conversations between Mr. Perez and Mr. Gonzalez were recorded, transcribed and translated. Mr. Gonzalez now argues that his Sixth Amendment right to confront his accusers was violated when I allowed the transcripts to go to the jury during deliberations because the transcripts contained dates and times that were hearsay and not discussed by any witness. Special Agent Robert Rodriguez testified that he received translated transcripts from an official court translator, and that the only changes he made to the transcripts were to identify Mr. Perez's voice when it appeared and to remove Spanish words, leaving only the English words. The transcripts were admitted into evidence, with no objection, with the dates and times on them.

When the exhibits were prepared to go to the jury for deliberation, defense counsel objected to the inclusion of the date and time on the transcripts. It is within my discretion to send exhibits to the jury to use during deliberations when those exhibits were admitted at trial. *United States v. Magana*, 118 F.3d 1173, 1183 n.7 (7th Cir. 1997). By failing to object that the date and time were hearsay when the transcripts were admitted, the defendants waived any argument as to their admission. *United States v. Camargo*, 908 F.2d 179, 183 (7th Cir. 1990). As for the

9

confrontation clause, the Sixth Amendment gives the defendant the
right to demand the presence of the declarant and the opportunity
to cross examine him or her. *United States v. Burton*, 937 F.2d
324, 328 (7th Cir. 1991). As to Special Agent Rodriguez, the Sixth
Amendment was satisfied by the opportunity to cross examine him.
*See id.* As to the transcriber and interpreter, the defendants
waived this right when they stipulated to his testimony. *See*
*United States v. Plitman*, 194 F.3d 59, 63 (2d Cir. 1999) (holding
that counsel in criminal case may waive Sixth Amendment
confrontation right by stipulating to admission of evidence, so
long as stipulation was a legitimate trial tactic or strategy);
*Hawkins v. Hannigan*, 185 F.3d 1146, 1155 (10th Cir. 1999) (same).

D.

When the government cross examined Mr. Gonzalez, he said that
he was told that the truck was "broken down" and he was going to
the warehouse to help repair it. During a break, the interpreter
indicated that the word he had translated as "broken down"[6] did not
necessarily mean that the truck was completely unable to move, but
could mean that there was simply something broken in the truck.
Mr. Gonzalez's attorney asked for an instruction clarifying the
translation, which I declined. He now claims that failing to give
an instruction and permitting the government to proceed by implying

[6] The Spanish word used by Mr. Gonzalez was "*des compuesto.*"

10

that "broken down" meant "undriveable" was an unfair denigration of Mr. Gonzalez's credibility that amounts to a denial of due process.

A foreign language translation is sufficiently accurate "if the translation reasonably conveys the intent or idea of the thought spoken." *United States v. Zambrana*, 841 F.2d 1320, 1337 (7th Cir. 1988). Here the translator said that "the translation is not inaccurate, but rather it has got many shades of meaning." The phrase "broken down" is susceptible to the same range of meanings in English; it may mean "having ceased to function," *Oxford English Dictionary* (2d ed. 1989), or simply "in poor condition," *Webster's II New Riverside Univ. Dictionary* 203 (1994). The interpretation of a foreign language translation is a question of fact for the jury to decide, *Zambrana*, 841 F.2d at 1337 (citing *United States v. Cruz*, 765 F.2d 1020, 1023 n.4 (11th Cir. 1985)), and as such it was not for me to instruct the jury on the meaning of "broken down." On redirect, Mr. Gonzalez had the opportunity to clarify what he meant by "broken down," and he did so.

E.

Mr. Perez testified at trial. He had pled in November, 2000 pursuant to a plea agreement which required his cooperation with the government. He decided he would not cooperate, and both he and the government moved to withdraw or revoke his plea in January, 2000. I granted the motions. Mr. Perez again pled guilty on a "blind plea," without an agreement, just before trial. The defense

11

theory about why Mr. Perez backed out was that he did not want to plead guilty to an offense of possession of cocaine when he believed that he was only transporting marijuana. The government's theory was that Mr. Perez was afraid to testify, and defense counsel objected that this raised an unfairly prejudicial inference that their clients had threatened Mr. Perez.

At trial, the government asked Mr. Perez if his reason for backing out of the plea agreement was that he was afraid, and Mr. Perez first said no, that it was because he did not want to plead guilty to what he was charged with (presumably he meant to possession of cocaine, though it is not entirely clear from his response). The AUSA then said "Well, sir, that's not what you told me before, is it?" and Mr. Perez answered "Yes, like I said before, right, I am worried about things, about my family, what's going to happen to me, the time that I am going to have to do, and I'm going to do the time." The AUSA said "Mr. Perez, even though the witness security program was explained to you, you were so scared that you did not want to testify, isn't that correct?" Mr. Perez responded that he had been under a lot of pressure, had not been well, had not been sleeping, and did not remember. The AUSA had no further questions, and on re-cross, Mr. Perez denied that he had ever been threatened or that his sister had ever told him that she was being followed.

Mr. Perez's testimony was interrupted by repeated objections, and all of the defendants objected to the line of questions about Mr. Perez's fear of testifying. Mr. Chavez objects that the AUSA did not have a good faith basis for asking Mr. Perez if he revoked his plea agreement because he was "afraid" and if he was "scared" to testify in spite of an offer of witness protection. At sidebar, I specifically asked the AUSA if he had a good faith basis for the questions; the AUSA responded that Mr. Perez had told him he was afraid. The defendants then objected that the AUSA would have to become a witness because his question amounted to testimony. But the AUSA's questions about what Mr. Perez had told him at an earlier meeting were proper confrontation with a prior inconsistent statement. When examining a witness about a prior inconsistent statement, the government need not disclose the contents of the statement (or produce the statement if written), but opposing counsel may request to see the statement or know its contents. *United States v. Marks*, 816 F.2d 1207, 1210 (7th Cir. 1987); Fed. R. Evid. 613(a). It was not an abuse of discretion to allow the question so long as the AUSA had a good faith basis for asking it, *United States v. Holt*, 817 F.2d 1264, 1274 (7th Cir. 1987), and I determined that he did. An attorney need not proffer a factual foundation for all questions asked;[7] a "well reasoned suspicion

---

[7] Although Mr. Perez was called by the government, the examination on redirect was an appropriate form of impeachment.
(continued...)

that a circumstance is true is sufficient." *See United States v. Sampol*, 636 F.2d 621, 658 (D.C. Cir. 1980).

Mr. Gonzalez also objects that the government never proved up the impeachment after the AUSA said "that's not what you told me before, is it?" There was no need to prove it up with extrinsic evidence of the statement. *See Oostendorp v. Khanna,* 937 F.2d 1177, 1181 (7th Cir. 1991). In any event, Mr. Perez admitted to making a prior statement that was inconsistent when he said "Yes, like I said before, right, I am worried about things, about my family, what's going to happen to me . . . ."[8] The form of the questioning was proper.

As to the substance of the statements, evidence of threats is not categorically inadmissible, rather it is subject to Fed. R. Evid. Rule 403. *United States v. Thomas*, 86 F.3d 647, 653 (7th Cir. 1996). That is, it is admissible unless the potential for unfair prejudice substantially outweighs its probative value. Fed. R. Evid. 403. Evidence of threats has limited probative value "unless the evidence bears directly on a specific credibility issue

---

[7](...continued)
*See United States v. Ienco*, 92 F.3d 564, 568 (7th Cir. 1996).

[8] Mr. Gonzalez cites cases involving improper oral argument by the prosecutor, *see, e.g., Hall v. United States*, 419 F2d 582, 585 (5th Cir. 1969) (holding that prosecutor's closing argument about threats not supported by the evidence); that is not the objection posed here. Moreover, I instructed the jury that questions and objections by lawyers are not evidence, nor are any lawyer's statements or arguments. *See* Jury Instruction No. 6.

regarding the threatened witness." *Id.* at 654. To begin with, no evidence of threats was introduced here, either by the government or defense counsel; Mr. Perez said that he was worried about his family and what was going to happen to him, but specifically denied that he had been threatened by anyone. Even if his testimony that he was "worried" or the government questions asking if he was "afraid" or "scared" could be construed as threat testimony, however, their probative value was not substantially outweighed by their potential for unfair prejudice.

Where there is no specific credibility issue or where the witness's only function is to testify about threats, the admission of such testimony may be error. *See Dudley v. Duckworth*, 854 F.2d 967, 971-972 (7th Cir. 1988) (holding that there was no basis in the record for determining that witness was actually afraid and that the evidence of threats was pretextual because it was "intended more to prejudice the defendants . . . than to explain any nervousness of the witness"); *Clark v. Duckworth*, 906 F.2d 1174, 1186 (7th Cir. 1990) (threat evidence had no probative value where there was no credibility question and witness testified *only* about threat); *Thomas*, 86 F.3d at 654 & n.13 (same). However, where the evidence of threats is necessary to impeach or rehabilitate a witness's credibility, and there is no indication that its admission was pretextual, it may be admissible in spite of

its potential for prejudice. *Gomez v. Ahitow*, 29 F.3d 1128, 1139 (7th Cir. 1994).

Here, the questions by defense counsel on cross examination and on re-cross raised the question of why Mr. Perez had decided to stop cooperating with the government and whether it had something to do with whether he would plead guilty to possession of cocaine or marijuana. The government did not put Mr. Perez on the stand to testify about a threat. The question of a threat did not even come up until Mr. Chavez's lawyer's final re-cross. Nor was the question about Mr. Perez's motivation in changing his plea a pretext; the AUSA was attempting to clarify that Mr. Perez's last-minute change of mind had nothing to do with what he believed about the nature of the substance that was found in his possession. Indeed, this presents the case, contemplated in *Thomas*, where "the evidence bears directly on a specific credibility issue regarding the . . . witness." 86 F.3d at 654. The testimony was admissible.

F.

The defendants also argue that it was error to allow the jury to see Mr. Gonzalez's wallet because it contained the business card of Mr. Chavez's lawyer, Mr. Meczyk, which had not been admitted into evidence. Mr. Gonzalez argues that this violated due process, and that the government's failure to disclose the card before trial was a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). He also argued that allowing the jury to see the business card was

16

equivalent to telling the jury that Mr. Gonzalez invoked his Sixth Amendment right to counsel. Finally, he argues that the inferences the jury may have drawn from the card -- *i.e.*, that the defendants knew each other or that Mr. Gonzalez was engaged in some kind of illegal behavior, the result of which might require the services of a lawyer -- were damaging to the defendants' credibility and therefore not harmless error. In a separate reply, Mr. Chavez hints at government misconduct, arguing that it was playing "hide and seek" by sending the wallet back to the jury with knowledge that the business card was in it.

A criminal defendant has a right to be tried on the basis of evidence admitted at his trial, and his Sixth Amendment right to confront the witnesses and evidence against him is violated when "extrajudicial" evidence is before the jury when it deliberates. *See United States v. Sababu*, 891 F.2d 1308, 1333 (7th Cir. 1989). Here the wallet containing Mr. Meczyk's card was admitted into evidence and sent back to the jury without objection, and Mr. Meczyk was aware that his card had been discovered in the wallet two days before trial. The government separately admitted four exhibits from Mr. Gonzalez's wallet that it used at trial. Mr. Meczyk claims that the government promised not to use the wallet or the card, so he had no way of knowing that the business card was still in the wallet. The government responds that it did not plan to introduce the wallet until the defense counsel made repeated

hearsay and chain of custody objections to the items from the wallet that were separately admitted. The attorneys for Mr. Rodriguez and Mr. Gonzalez did not discover that Mr. Meczyk's card had been found in Mr. Gonzalez's wallet until Mr. Chavez's motion for a mistrial.

The business card was before the jury by mistake; there is no evidence that the government intentionally concealed the existence of the business card from the defendants. The government sent a letter to Mr. Gonzalez's previous counsel in August 2000 and said that, in addition to its Rule 16 discovery, at defense counsel's request, it would "make available for your inspection all of the physical and documentary evidence either seized from your client or to be used at trial." On January 9, 2001, the AUSA sent a letter to counsel for all of the defendants in which he said "[a]s always, I urge you to contact me if you wish to view any of the original materials prior to trial."[9] At a February 9 hearing about the wallet, the AUSA said that the government did not discover the business card until January 27, 2001, two days before trial, and that he called Mr. Meczyk as soon as he found it.

---

[9] Indeed, this resolves the question of whether failure to disclose the business card was a *Brady* violation. There can be no government "concealment" when defense counsel has access to the evidence before trial by exercise of reasonable diligence. *United States v. Earnest*, 129 F.3d. 906, 910 (7th Cir. 1997). Here, the defense attorneys had an opportunity to go through the wallet before trial, when the wallet was admitted, and again before it went back to the jury.

Nor does the record support an inference that the government intended to sneak the business card in by failing to mention it with the other exhibits in the wallet. Mr. Chavez argues that Agent McClarence discussed all of the items in the wallet prior to its admission, but failed to mention the business card, and therefore there was no basis for the defendants to object to the admission of the wallet. However, the government moved the evidence bag with its contents, including the wallet, into evidence without objection, *then* discussed four separately marked exhibits, which had been removed from the wallet and disclosed prior to trial. The only contents of the wallet to which the government referred that were not separately marked were Mr. Gonzalez's drivers' license and state I.D. card (presumably to establish that the wallet in fact belonged to Mr. Gonzalez). The discussion of the contents of the wallet came after it was admitted, so could not be, as Mr. Chavez suggests, a ruse to dissuade the defendants from further inquiry.

However, the record is ambiguous as to whether the wallet and its contents or merely the wallet were admitted. Holding up the evidence bag that contained the wallet, the AUSA asked Agent McClarence "Do you recognize that, the [evidence] bag and its contents as items of evidence that were recovered on May 25th of 2000?" Agent McClarence answered that he did, and the government offered "Government Exhibit Wallet" into evidence. Presumably the

contents of the bag would include whatever was inside the wallet, which would suggest that the contents were in evidence.[10] Resort to case law is unavailing; courts in analogous cases, without discussion of any guiding principles, have held that evidence was unadmitted where it was "discovered" to be contained in an admitted exhibit. *See Farese v. United States*, 428 F.2d 178 (5th Cir. 1970) (finding Sixth Amendment violation where jury discovered $750 in cash in the pocket of shirt inside suitcase that was admitted as composite exhibit; cash was unadmitted evidence); *New Jersey v. Anderson*, 598 A.2d 229, 232 (N.J. Super. Ct. App. Div. 1991) (finding error where jury was allowed to consider jewelry tag where sports bag had been admitted during trial and jury discovered tag inside it during deliberations; tag was unadmitted evidence); *but see Jones v. Texas*, No. 09-06-400 CR, 1998 WL 428876, at *4 (Tex. App. July 29, 1998) (unpublished opinion) (noting that wallet was admitted evidence where it was contained in purse that was admitted into evidence and where there was testimony about the wallet). The fact remains, however, that neither Mr. Gonzalez's nor Mr. Rodriguez's lawyer was even aware of the existence of the business card, and Mr. Meczyk claims that the government promised not to admit the card, so he assumed it would not be in the wallet. No

---

[10] It is hard to fathom the significance of the wallet alone, which is merely a piece of leather. The significance of the wallet in this case was what it contained -- Mr. Gonzalez's driver's license and ID card, because that tied it to the items separately marked as exhibits.

reference was made to the business card when other contents of the wallet were discussed.[11] Regardless of whether the business card itself was admitted evidence, I conclude that none of the defendants had an opportunity to "impeach its significance, argue to the jury about its proper characterization and probative value [or] have limiting instructions provided by the judge." *United States ex rel. Eddington v. Lane*, 617 F. Supp. 392, 397 (N.D. Ill. 1985) (citing *United States v. Bruscino*, 662 F.2d 450, 458 (7th Cir. 1981)). This is a "classic deprivation of the [Sixth Amendment] right of confrontation." *Id.* at 398.[12]

I must now determine if that constitutional violation provides the basis for a new trial. *See id.* At the hearing of February 9, counsel for Mr. Chavez argued that the defendants were entitled to a new trial because of the likelihood that the jury had seen the business card, which was the top card in the wallet. In other circuits, upon finding error, in order to determine whether the defendant has been prejudiced courts have focused on the likelihood

---

[11] This is in stark contrast to the driver's license and ID card, which were removed from the wallet by Agent McClarence while he was on the stand, identified, tendered to Mr. Gonzalez's attorney, and *published to the jury*. The defendants had ample opportunity to cross examine witnesses about these pieces of evidence.

[12] Because I conclude that the presence of the business card during jury deliberations violated the defendants' Sixth Amendment right to confront the evidence against them, I do not reach the claim that submission of the card to the jury was tantamount to statements by the government that Mr. Gonzalez had invoked his Sixth Amendement right to counsel.

that the jury actually looked at the extra-judicial material. *See*
*Osborne v. United States*, 351 F.2d 111, 118 (8th Cir. 1965)
(reversing conviction because it was impossible to determine
whether jury had looked at unadmitted exhibit); *Farese*, 428 F.2d at
181 ("'We are unable to evaluate what weight the jury attached to
[the unadmitted exhibits]. Therefore a new trial must be had.'").
Review for harmless error, however, assumes that the jury did see
the evidence and asks what impact, if any, the exposure had on the
verdict. *See Sababu*, 891 F.2d at 1333; *Dallago v. United States*,
427 F.2d 546, 557 (D.C. Cir. 1969).

Where a jury is exposed to material that was not properly in
evidence, a new trial is required "only where there is a
'reasonable probability' that the documents affected the jury
verdict." *Sababu*, 891 F.2d at 1333. The "reasonable probability"
standard is the same as the "harmless error beyond a reasonable
doubt" standard used for other constitutional violations. *See*
*United States v. Bruscino*, 687 F.2d 938, 940 (7th Cir. 1982). The
defendants argue that the presence of the business card in the jury
room destroyed the credibility of Mr. Chavez and Mr. Gonzalez, both
of whom testified, and undercut the defense that Mr. Chavez did not
know Mr. Gonzalez and Mr. Rodriguez.

To prove that the defendants were part of a conspiracy, the
government need not prove that the defendants knew one another.
*See United States v. Shorter*, 54 F.3d 1248, 1255 (7th Cir. 1995);

22

Jury Instruction No. 26. However, it is not enough for the government to show that the evidence was not necessary to convict; it must prove "beyond reasonable doubt that the defendant would have been convicted absent the [presence of unconstitutional evidence]." *United States ex rel. Burke v. Greer*, 756 F.2d 1295, 1302 (7th Cir. 1985). "The case against the defendant[s] must be 'overwhelming' in order to apply the harmless error rule." *Id.* I must look at the evidence against each defendant individually. *See United States v. Carraway*, 108 F.3d 745, 756 (7th Cir. 1997).

Mr. Gonzalez is a recent illegal immigrant in his early twenties, and he testified that he had no legitimate employment in the United States prior to his arrest. He admitted that he called Mr. Perez to set up the meeting at the Comfort Inn. Mr. Perez did not know to whom he was supposed to deliver the drugs, and he was supposed to receive a page to set up the delivery; that page came from the cell phone that was found in Mr. Gonzalez's car when he was arrested. The government found a receipt in Mr. Gonzalez's wallet with notations (the numbers 276 and 55) that roughly matched the transcript of one of his telephone calls with Mr. Perez about the location of the Comfort Inn (exit 267 off Interstate 55), which suggests that he was writing down the location of the Comfort Inn as he was talking to Mr. Perez. On the same piece of paper there was a list of numbers adding up to 127 with the notation "one for the driver"; the government recovered 139 bricks of cocaine from

the truck. A jury might reasonably infer that he meant to meet with Mr. Perez to arrange the delivery of the drugs, that he expected a certain quantity of drugs that was close to the actual quantity recovered, and that the driver's payment was to be one package of cocaine. Mr. Gonzalez denied that he had written the notes and his attorney challenged the chain of custody, but Mr. Perez identified him as being present at the meetings at the Comfort Inn and the oasis, and Mr. Gonzalez admits that he was at both meetings and that he intended to go to the warehouse. He claimed that he thought the truck was broken down, and that he had no knowledge that there were drugs involved. But in the tape recordings of ten separate telephone calls with Mr. Perez, there was no mention that the truck was broken or in need of any repair. Mr. Gonzalez went to buy hex wrenches and screwdrivers with Ramon, and had them in the car when he was on the way to the warehouse. It might be inferred that such tools would be used for opening a sealed compartment, and there was no evidence of any other tools in the car that might have been necessary to repair a tractor trailer truck. Mr. Gonzalez received two telephone calls from Mr. Rodriguez on his way to the warehouse at approximately the same time that Mr. Perez said he overheard Mr. Rodriguez call someone and say he was worried he had been followed by the police. Mr. Gonzalez was arrested after he pulled up the driveway apron of the warehouse (where DEA agents were standing with Mr. Rodriguez and

Mr. Chavez in custody), turned his car around, and took off at high speed. The agent who chased him testified that he was driving 60 or 70 m.p.h. in pursuit of Mr. Gonzalez. Evidence of flight is admissible to show both guilt and consciousness of guilt. *United States v. Zabic*, 745 F.2d 464, 471 (7th Cir. 1984). Even without the business card, the evidence against Mr. Gonzalez is overwhelming.

So is the evidence against Mr. Rodriguez. He was a childhood friend of Mr. Gonzalez, and, like Mr. Gonzalez, a recent illegal immigrant. He went with Mr. Gonzalez to the Comfort Inn to meet Mr. Perez at 2:30 a.m., and he followed Mr. Gonzalez to the meeting at the oasis, although Mr. Gonzalez said that he was not present for the discussion with Mr. Perez and Ramon. He received telephone calls from and made telephone calls to the same cell phone that was used to page Mr. Perez to set up the meeting at the Comfort Inn. Although Mr. Gonzalez said that Mr. Rodriguez did not participate in the oasis meeting, Mr. Rodriguez led Mr. Perez to the warehouse, and so must have received directions at the meeting, or at least from someone who did participate. On arrival at the warehouse, Mr. Rodriguez called someone to express concern that he had been followed by the police; cell phone records show that he made two calls to the phone in Mr. Gonzalez's car while Mr. Gonzalez was *en route* to the warehouse. Mr. Rodriguez was at the warehouse when the police arrived, and he yelled "run, run" in Spanish, and

attempted to flee. From his warning and flight, the jury could infer his guilt, as well as his consciousness that he was at the warehouse for some illegal purpose. *See Zabic*, 745 F.2d at 471. The government's evidence was overwhelming.

With respect to Mr. Chavez, the most damaging evidence was his role in arranging for a warehouse, on an illicit if not illegal basis, to be available after hours for the delivery of the cocaine. He took the stand and told an elaborate, implausible story that the reason he arranged for the warehouse was to rig a tractor trailer truck with nitrous oxide to cheat at a tractor pull. He testified that he was personally very interested in tractor pulls, and that he sometimes watched such competitions on television. He said that his brother Ramon called him and asked him to find a warehouse to "soup up" a truck for a tractor pull competition. But he never said that his brother had any interest in tractor pulls. And he said that he and his brother never discussed "souping up" the truck in the forty minutes they were together in the car on the way from the city to the oasis. He told Acme warehouse employees that he needed the warehouse to unload merchandise after hours. On the stand, he denied that he said "hot" merchandise, but that was the testimony of one of the warehouse employees. He offered the warehouse employees $500 each, apparently to be paid by Ramon, for their assistance in making the warehouse available. He claimed that the reason he didn't tell them that he wanted the warehouse

for reasons relating to a tractor pull was because he knew that rigging the truck with nitrous oxide was cheating.

No criminal defendant has the burden of proof, and the Fifth Amendment guarantees a defendant's right not to testify, *see United States v. Talbott*, 78 F.3d 1183, 1185 (7th Cir. 1996), but once a defendant takes the stand, the jury is free to assess his credibility and accept or reject his alibi. *See Phelps v. Duckworth*, 772 F.2d 1410, 1414 (7th Cir. 1985) (holding that harmless error is not precluded simply because defendant offers alibi, particularly where the alibi is implausible). Mr. Chavez's credibility was severely damaged by his own implausible alibi.

Moreover, Mr. Chavez was present at the oasis and at the warehouse, and when Mr. Rodriguez yelled "run, run," he ran out the back door of the warehouse as the police came in the front door. He testified that he ran because he thought that, while he was in the restroom, people had started working on the truck and the nitrous oxide was going to explode. However, his brother, who was ostensibly the one who wanted to rig the truck, never showed up at the warehouse. Moreover, the truck was, by all appearances, a road truck, which would not be on a truck used for tractor pulling, and not one equipped for a tractor pull -- the videos that Mr. Chavez showed of trucks used in actual tractor pulls only highlighted the difference. The jury could reasonably infer that Mr. Chavez ran out of fear of getting caught, not out of fear that something

related to the truck was going to explode.  There is no reasonable doubt as to Mr. Chavez's participation in the conspiracy.

Although it is not necessary to show that the defendants knew each other, *see Shorter*, 54 F.3d at 1255, there is ample evidence without the business card that the defendants at least knew of each others' existence.  Mr. Gonzalez and Mr. Rodriguez arranged a meeting at the oasis, which was about a mile from the warehouse for which Mr. Chavez made arrangements.  All three defendants were present at the meeting at the oasis; they need not have spoken to each other to have understood their respective roles.  Finally, all three were at or near the warehouse when they were arrested, Mr. Rodriguez alerted both Mr. Gonzalez and Mr. Chavez to the presence of the police, and all three attempted flight.  In light of this evidence, the business card was merely cumulative evidence of the connection between the defendants, and there is overwhelming evidence to support each conviction, so any error was harmless. *See United States v. Bruscino*, 687 F.2d 938, 942 (7th Cir. 1982). The motions for a mistrial and a new trial are DENIED.

ENTER ORDER:

_Elaine E. Bucklo_ (signature)
**Elaine E. Bucklo**
United States District Judge

Dated:  May 7, 2001